## 21184. FAIR v. BALKCOM, Warden.

Argued March 13, 1961—Decided April 6, 1961.

*D. L. Hollowell, C. B. King*, for plaintiff in error.

*B. Daniel Dubberly, Jr., Deputy Assistant Attorney-General, Eugene Cook, Attorney-General, Earl L. Hickman, Assistant Attorney-General*, contra.

Grice, Justice.   James Fair, Jr., assigned as error the dismissal of his habeas corpus petition and his consequent remand to the respondent R. P. Balkcom, warden of Reidsville State Prison.   The proceedings, filed in the City Court of Reidsville, complained that petitioner was denied his constitutional rights to the benefit of counsel and reasonable time to prepare his case when, after entering a plea of guilty, he was sentenced by the Judge of the Superior Court of Early County, Georgia, to be electrocuted for the murder of an eight year old negro girl in Blakely, Georgia.

The record of the proceedings now under review consists of 219 pages, more than half of which is the petition for habeas corpus, with its exhibits, purporting to show the events leading up to the filing of such petition.   Besides relating Fair's arrest, arraignment, plea of guilty and sentencing, the petition gives his version of what transpired with reference to his previous unsuccessful efforts to obtain the following: (1) a new trial; (2) withdrawal of his plea of guilty; (3) certification of three bills of exceptions by the Judge of the Early Superior Court; (4) mandamus from this court to compel such certification; and (5) a writ of habeas corpus from the United States District Court for the Middle District of Georgia.

The evidence adduced upon the habeas corpus hearing covers a wide area and shows the following sequence of events.

About one o'clock in the morning of Sunday, May 15, Fair, a

negro who had some month and a half before come from New Jersey to live in Early County, was arrested and confined in the city jail by the Blakely Chief of Police. Other negroes had summoned the chief because they had last seen the child in Fair's company. Later in the day Fair was taken to the sheriff's quarters in the county jail for questioning. At approximately sundown Fair made a full confession, first to the sheriff and later, at the sheriff's direction, to others called in by the sheriff.

Upon the habeas corpus hearing, Fair testified that he did not commit the crime but after being cursed, threatened and frightened by the sheriff and told by him that he had once been able to get a negro a life sentence rather than the death sentence in a murder case because he pleaded guilty, he decided to confess. The sheriff died before the habeas corpus hearing. Fair also testified that, previous to his incarceration in Blakely, he had never been arrested, never been in trouble and never been in court.

In the late afternoon or early evening of the same day, Sunday, May 15, the sheriff complied with the request Fair had made before his initial confession, that his mother, who lived in Bayonne, New Jersey, be contacted. Both the sheriff and Fair talked to her, the sheriff listening on an extension in view of Fair while Fair talked. The testimony with reference to what was said during these telephone conversations is at variance. Fair stated that he told his mother he was guilty. His mother denied that he did so. She also stated that she told the sheriff that she would immediately go to Blakely and arrange for legal counsel for her son.

On the next day, Monday, May 16, the grand jury of that county met, having been convened sometime in March for this date. It indicted Fair for both rape and murder of the child.

On Tuesday, May 17, at about eight o'cock in the morning, Fair's mother telephoned the solicitor general of that circuit. Their versions differ as to a part of what was said. He testified that he told her that if Fair did not plead guilty no trial would be had before the following Monday, May 23. She testified that he put no condition upon it, but stated that nothing would be done until either Friday, May 20 or Monday, May 23. Both, how-

ever, agreed that she did state that she was leaving immediately for Blakely.

At about four o'clock in the afternoon of the same day, Tuesday, May 17, upon adjournment of the grand jury, the judge sent for Fair for the purpose of arraignment, according to the solicitor general's account of events. His testimony contains the only orderly narration of the arraignment and sentencing to be found in the record, so it will be used here. He stated that in the presence of the judge, the sheriff, the clerk, the court reporter, two deputy sheriffs and another one or so, he read the indictment to Fair, told him what he was charged with and then asked if he had a lawyer. Upon Fair's reply that he did not, the solicitor general told him that the court would appoint one and that it would not cost Fair anything. Fair answered that he "did not want a lawyer." Then the judge informed Fair that he was entitled to counsel and that he would appoint counsel for him if he so desired. Fair stated that he did not wish counsel, but wanted to plead guilty. Upon the judge's statement that if he pleaded guilty he could be given the death sentence, Fair asked whether there would be a trial if he pleaded guilty and was told by the judge that there would not. Fair then approached the judge, told him that he wanted to enter a plea of guilty, that he was guilty, and went into detail as to how he had raped the child and killed her with a pipe. In response to the questions of the solicitor general, Fair stated that he had already confessed the crime and that no one had threatened him or promised him any reward. The judge again asked Fair if he wanted to enter a plea of guilty, and Fair answered that he did. The solicitor general testified that Fair then signed his name upon the back of the murder indictment so as to enter the plea of guilty.

Fair testified that he was removed from his cell at the county jail and was told by the sheriff only that he had to go before the judge, that the judge wanted to see him. He testified that he did not recall being asked whether he wanted any counsel other than court appointed, and as to that he "told him, no sir, I don't want no appointed lawyer," giving as his reason that he had no confidence in them and repeating that he did not want "no court

appointed lawyer." Fair also stated that he did not recall the judge telling him that he could be given the death sentence if he pleaded guilty, and that he did not recall telling the judge and others present that he was guilty and describing the crime. He did recall signing a paper but stated that he didn't know what it was, that he didn't know anything about law or a court of law.

The record shows that at no time before being sentenced had Fair employed legal counsel or had any been appointed for him. The record does not show that the judge had any data other than Fair's statements before him in pronouncing the death sentence. And in so far as this record shows, the judge had not been informed that Fair's mother had told both the solicitor general and the sheriff that she was proceeding immediately to Blakely and had told the latter that she was coming to obtain legal counsel for her son.

A few minutes before five o'clock on the afternoon of Tuesday, May 17, Fair's mother arrived in Blakely, only to find that the death sentence had been imposed on her son shortly before.

The foregoing events, beginning with the crime itself on Saturday evening (according to Fair's confession which is the only evidence in the record as to the time), then his arrest and confinement and confession on Sunday, his indictment on Monday, and terminating on Tuesday when he was, without counsel, arraigned and sentenced to be executed, took place within less than 72 hours. Actually, the time from Fair's arrest to the sentencing was only about 63 hours.

An explanation of the timing of those events was given by the solicitor general. He testified that it was the custom in that county upon the adjournment of the grand jury for all felony prisoners confined to jail to be immediately brought before the judge for arraignment so as to ascertain whether they had or needed counsel. Fair was the only felony prisoner in jail at that time. As to the time element in these proceedings, the solicitor general testified that "We were not in a race with [his] mother to take a plea of guilty before she arrived in Blakely . . . It just happened that he did it on Saturday night and confessed on Sunday and the grand jury was actually in fact in session on Monday and they indicted him."

We do not question that both the solicitor general and the superior court judge believed that this petitioner was being accorded his constitutional rights.

Our duty is to determine whether those rights were actually accorded to petitioner.

We are called upon to decide whether he was afforded due process and equal protection under the 14th Amendment of the United States Constitution (*Code* § 1-815), and due process and benefit of counsel under the Georgia Constitution (*Code* §§ 2-103 and 2-105). For our purposes these guaranties are a defendant's rights to benefit of counsel and reasonable time to prepare his case. Under the facts of this record these two rights are so interwoven that they cannot be separately treated. In applying these constitutional guaranties to the record here, where there is conflict, we accept the testimony of the respondent's witnesses instead of that of petitioner's since the habeas corpus judge, as trior, found against the petitioner. *Grammer v. Balkcom*, 215 Ga. 395 (110 S. E. 2d 749).

The Georgia Constitution provides that "Every person charged with an offense against the laws of this State shall have the privilege and benefit of counsel . . . " *Code* § 2-105.

The effect of this guaranty, which became a part of our Georgia constitutional law in 1798, is treated in *Walker v. State*, 194 Ga. 727 (1) (22 S. E. 2d 462), where this court held: "The provision [*Code* § 2-105] . . . guarantees such person who is unable to employ counsel the right to have counsel appointed for him by the court; and such provision entitles an accused who is able to employ counsel a reasonable opportunity to procure counsel of his own selection."

That benefit of counsel is not an empty right has been emphasized time and time again. Mr. Chief Justice Russell, speaking for this court in *Jackson v. State*, 176 Ga. 148 (1) (167 S. E. 109), stated: "The right [to benefit of counsel] guaranteed by the constitution is one of substance, and not of symbols."

That reasonable time is necessary for the right to be truly a substantial one has been recognized in many cases. "The constitutional guaranty amounts to nothing, unless the counsel selected by the accused or appointed by the court are given a reasonable

time to ascertain what is the character of the case that the accused is called upon to defend." *Nick v. State,* 128 Ga. 573 (58 S. E. 48). In this same connection see *Blackman v. State,* 76 Ga. 288; *Harris v. State,* 119 Ga. 114 (45 S. E. 973); *Reliford v. State,* 140 Ga. 777 (79 S. E. 1128); *Sheppard v. State,* 165 Ga. 460 (141 S. E. 196); *Jackson v. State,* 176 Ga. 148, supra; *Edwards v. State,* 204 Ga. 384 (50 S. E. 2d 10); and *Smith v. State,* 215 Ga. 362 (110 S. E. 2d 635). While the time for preparation of such a case is generally a matter for the discretion of the trial judge, reviewing courts, when called upon, have to review the exercise of that discretion. The theme which runs through these and other cases is that "Undue haste in the administration of the criminal law is as much to be condemned as unnecessary delay. The true course lies between these two extremes." *Harris v. State,* 119 Ga. 114, 115, supra.

Mere shortness of time, however, does not always impair this right. In fact, the speedy bringing to justice of the guilty is regarded as a deterrent of crime. It is only when events move swiftly and constitutional guaranties are overridden in the process that reviewing courts are required to act.

There have been comparatively few reported cases in this State where a capital felony was handled as fast as was this one. And, it is significant that in none of those cases was the defendant without legal counsel. Some of those holding sufficient time are: *Walton v. State,* 79 Ga. 446 (5 S. E. 203); *Charlon v. State,* 106 Ga. 400 (32 S. E. 347); *Harris v. State,* 119 Ga. 114, supra; *Nick v. State,* 128 Ga. 573, supra; and *Waters v. State,* 158 Ga. 510 (123 S. E. 806). Those holding not sufficient time include *Blackman v. State,* 76 Ga. 288, supra; *Reliford v. State,* 140 Ga. 777, supra; *Cummings v. State,* 151 Ga. 593 (107 S. E. 771); *Sheppard v. State,* 165 Ga. 460, supra; and *Jackson v. State,* 176 Ga. 148, supra. These cases differ as to the facts and circumstances involved, so that what might have been sufficient time in one may not have been enough in another. What may be sufficient preparation time for a defendant with counsel is generally not enough for one who is without it. Every defendant, including those who wish to plead guilty, is entitled

to reasonable time to formulate an adequate presentation so that the court will have necessary information for proper disposition.

The right to benefit of counsel is not restricted to the trial itself. Just when it commences we are not now called upon to decide. This court has held that it does include the right to advice of counsel as to whether the accused should plead guilty. *Elam v. Rowland,* 194 Ga. 58, 60 (20 S. E. 2d 572). See also, in this connection, *Strickland v. State,* 199 Ga. 792 (35 S. E. 2d 463). And certainly this right exists once an indictment charging a felony has been returned. The Georgia constitutional provision (*Code* § 2-105) guarantees that "Every person *charged with* an offense against the laws of this State shall have the privilege and benefit of counsel . . . " (Emphasis supplied.) It does not say "Every person *on trial for* an offense . . ."

This right includes the benefit of counsel at all stages of the arraignment and sufficiently prior thereto for adequate preparation. On this subject generally, see 22 C. J. S., Criminal Law, § 411, p. 632 (including pocket part) and 14 Am. Jur., Criminal Law, § 167 (pocket part, p. 174).

This constitutional guaranty recognizes that the guilty as well as the innocent need counsel by reciting that "*Every* person charged with an offense . . . " (Emphasis supplied.)

The entering of a plea of guilty to murder, the sentence for which is death or life imprisonment, is so unusual that judges have taken special precautions. "Even pleas of guilty have been rarely accepted until counsel assigned to the defense of such criminals have looked into the merits of the cause and recommended their acceptance by the court." *Delk v. State,* 99 Ga. 667, 670 (26 S. E. 752). "Like a confession out of court, it [a plea of guilty] ought to be scanned with care and received with caution. The judge is not bound to receive such a plea at all, and in capital cases frequently declines to do so." *Griffin v. State,* 12 Ga. App. 615, 622 (77 S. E. 1080), quoted approvingly in *Strickland v. State,* 199 Ga. 792, supra. The enactment of Ga. L. 1956, p. 737, authorizes the judge, in his descretion, to sentence a defendant to life imprisonment instead of to death. Even after a plea of guilty has been entered and sentence has been imposed, the judge, in his discretion, may

allow the plea to be withdrawn. *Strickland v. State,* 199 Ga. 792, supra.

With these authorities and principles in mind, let us return to the salient facts of this case.

Here petitioner was arraigned without having benefit of legal counsel. No friends or family were present. The arraignment proceeding, according to the solicitor general's testimony, began by his reading to Fair the indictment charging that he had murdered the little child. Prior to responding to such a charge, any defendant needs capable legal counsel in order to determine such vital questions as whether the indictment is properly drawn, whether the accused has capacity to commit crime, whether the evidence is sufficient to convict and, in the final analysis, whether the defendant should stand trial or appeal to the judge for a lighter sentence. It would be expecting too much of any defendant, alone, to answer for himself such questions as these. No decision made by any person during this life is of greater consequence except a spiritual one to obtain assurance of life hereafter.

In this situation Fair chose to respond that he was guilty. Whether he was motivated by pangs of guilt from committing this horrible crime or by what he thought was the helplessness and hopelessness of his situation, or by whatever it was, we, of course, do not know and will not speculate.

Waiver is not involved here. Fair's declination of counsel after the indictment was read to him could not cure his previous unrepresented status.

Therefore, we do not reach the question whether the facts which transpired later in the arraignment constituted a waiver of benefit of counsel.

It is clear to us that the lack of time afforded to this defendant, coupled with his lack of counsel, resulted in denial of his constitutional rights to due process and benefit of counsel.

In holding that this defendant was not afforded these constitutional guaranties, we do not indicate whether he is guilty or innocent. Guilt or innocence is not the question here. That issue is for determination in the Superior Court of Early County.

The petitioner is not entitled to be released. He must face the charges against him. He is hereby remanded to the custody

of the respondent prison warden, who is hereby ordered to deliver him to the custody of the Sheriff of Early County, Georgia, for further proceedings in the superior court of that county. Let the plea of guilty be withdrawn; let the judgment and sentence of the Superior Court of Early County against this petitioner be vacated and set aside; and let the accused be arraigned as though no plea had been entered.

*Judgment reversed with direction. All the Justices concur.*